# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA    )
    )
    v.    )    **Case No. 1:23-cr-37**
    )
CHRISTIAN DANIEL BAEZ    )

## MEMORANDUM OPINION

**Susan Paradise Baxter, United States District Judge**

On August 28, 2023, law enforcement officers entered the home of Christian Daniel Baez ("Baez"), the Defendant in this case, and effectuated a warrantless arrest. After detaining Baez and securing a search warrant, officers seized certain items of evidence from Baez's residence and car.

Baez was subsequently indicted on charges of unlawfully possessing a firearm and ammunition as a felon and possessing with intent to distribute ("PWID") cocaine. He filed a suppression motion in relation to these charges, and the Court held an evidentiary hearing on July 24, 2024.

At the hearing, Pennsylvania State Trooper Jon Matson testified on behalf of the United States. The Government offered into evidence a surveillance video of the events that preceded Baez's arrest. Two witnesses, J.G. and A.B.,[1] offered testimony on behalf of the defense. The Court also viewed a recording of officers entering Baez's residence, which A.B. captured on his cellphone. Following the hearing, Baez filed a second motion to suppress evidence, relating to a different aspect of the underlying criminal investigation.

---

[1] Because these individuals are not charged with any crimes, the Court will refer to them by their initials.

In October of 2024, the grand jury returned a superseding indictment, which amended the PWID charge to attempted PWID. *See* ECF No. 60. The Court dismissed Baez's first two suppression motions as moot, but Baez has now filed a third motion to suppress the Government's evidence as it relates to the charges in the Superseding Indictment. ECF No. 79. Both the Government and the defense have had an opportunity to brief this most recently filed motion. *See* ECF Nos. 79, 82, and 83.

The Court has reviewed the parties' filings relative to Baez's third suppression motion, and it has also considered the evidentiary record established at the July 24, 2024 hearing. The Court has determined that no further evidentiary hearing or record development is necessary for an adjudication of the pending motion. Based on the credible testimony and evidence in the record, the uncontested matters set forth in the parties' respective filings, and the analysis set forth below, the Court will deny Baez's third motion to suppress evidence.

## I. BACKGROUND

### A. Uncontested Facts

On August 24, 2023, the United States Postal Service interdicted a package originating from Puerto Rico that was addressed to an individual at 531 East 24th Street in Erie, Pennsylvania. Postal agents sought a warrant to search the contents of the package based on the fact that: (1) Puerto Rico is known to be a drug source territory, (2) the purported sender was not associated with the return address listed on the package, and (3) the package had been presented to a drug canine, which positively alerted for the presence of drugs.

On August 25, 2023, Chief United States Magistrate Judge Richard A. Lanzillo issued a search warrant for the package. Agents then searched the package and allegedly found it to

contain approximately two kilograms of cocaine, which was seized by the agents and replaced with sham material.

Law enforcement agents then acquired an anticipatory search warrant for the residence at 531 East 24th Street and arranged for a controlled delivery to that address. The triggering event identified in the search warrant was the parcel being taken inside the house.

On August 28, 2023, the Pennsylvania State Police facilitated the controlled delivery of the parcel to the East 24th Street residence. PSP Trooper Jon Matson participated in both the controlled delivery and the ensuing investigation.

The night before the package was to be delivered, Trooper Matson's team placed a surveillance camera directly across from the targeted residence. The camera was set up to stream live footage to an iPad that was being monitored by members of the surveillance team. In addition, officers arranged for a fixed wing airplane to conduct overhead surveillance during the controlled delivery. Trooper Matson also personally surveilled the situation from his vehicle.

Several hours prior to the scheduled delivery, Trooper Matson drove by the house at 531East 24th Street and observed Baez parked near the residence in a vehicle that was registered in his own name. Trooper Matson knew Baez as the subject of a previous drug investigation and was able to recognize Baez from his driver's license photo and surveillance pictures. Matson had been advised that Baez was a large-scale dealer, and he knew from experience that large-scale drug traffickers commonly possess firearms to protect themselves, their drugs, and their drug proceeds.

The controlled delivery was completed when a postal agent pulled up to the East 24th Street residence, walked the parcel to the porch area and set the package down near the porch rail in view of the surveillance camera. A few moments later, a female exited the house, picked up

the parcel, walked it over to Baez's car, and handed the package to Baez through the passenger side front window.[2]

After receiving the package, Baez drove approximately 4.2 miles to his home at 1685 West 15th Street in the City of Erie. Using the overhead fixed wing airplane as well as multiple ground units, Matson's team was able to maintain constant surveillance of Baez from the time he received the package to the time he arrived at his residence on West 15th Street. An undercover trooper was also present to conduct surveillance of Baez's home.

Once he arrived at his residence, Baez exited his vehicle without the package and greeted a female later identified as J.G., who had arrived on the scene at around the same time. After J.G. entered the residence, Baez retrieved the package from his car and followed her inside.

Shortly thereafter, Trooper Matson pulled up to the residence with several other law enforcement officers, some of whom proceeded to the front of the home with Matson, while others proceeded toward the rear of the structure. All of the officers wore clothing and/or had equipment clearly identifying themselves as law enforcement officers.

There is no dispute that the officers effectuated a warrantless entry into Baez's home and detained him there. It is also uncontested that, prior to being detained, Baez exited the rear of his home and discarded a package over a fence onto a neighboring property. Baez then proceeded back into the residence, where he was held by police officers while Matson left the premises to secure a search warrant.

After Matson obtained the warrant, officers searched Baez's residence and car. In the process, they allegedly recovered a 10mm Glock pistol, several pounds of marijuana, numerous scales, small plastic baggies, a plastic baggie containing 64 rounds of 10mm ammunition, a box

_____

[2] Because the package was not taken inside the East 24th Street residence, the "triggering" event did not occur, and the residence was not searched.

of 31 rounds of .38 special ammunition, a vacuum sealer, cutting agents, several cell phones, body armor, and indicia of Baez's residency.

### B. Disputed Facts Concerning the Officers' Entry

The primary factual dispute in this case concerns the manner and timing of the officers' warrantless entry into Baez's home.

At the suppression hearing, Matson testified that he proceeded to the front entrance to the home door and announced the officers' presence. He acknowledged that one of the officers on site may have yelled "search warrant," even though no warrant had yet been obtained either to search the home or to arrest Baez. He claimed that, shortly after announcing the officers' presence, he heard an officer yell "compromised," meaning that someone within the residence had seen the officers and was not opening the door. Matson then heard another officer yell over the radio that Baez was "running out the back" and was throwing the package "over the fence." Matson stated that, at this point, he and the other officers entered the front door of the residence. Once inside, they found J.G. lying on a couch in the living room. As Matson continued past the living room toward the kitchen area, Baez was reentering the kitchen through the back door of the house. Baez and J.G. were then detained, and the residence was secured, at which point Matson left the scene to apply for a warrant to search Baez's house and car.

J.G. testified at the hearing on behalf of the defense. She stated that she had just gotten off work and had been in the house for less than ten minutes when the officers arrived. She was lying on the couch directly by the front door and estimated that only three to four seconds elapsed between the time the police knocked on the door and the moment they breached the entrance. She stated that neither she nor Baez was aware of the officers' presence prior to their entry, and she did not have time to answer the door before the officers forced their way in. Baez

had been standing between the living room and the kitchen area when the police entered, and J.G. believed that he probably went from there into the kitchen. When asked if Baez exited the rear of the residence, J.G. stated that she "didn't see anything" because the events unfolded so quickly. The next time she saw Baez after the officers' entry was when he was detained on the floor of the kitchen area. She denied seeing Baez in possession of a parcel, either before or after the police arrived.

A.B. also testified on behalf of the defense. A.B. was working across the street from Baez's residence on August 28, 2023 and witnessed the police breach the front portion of the structure. A.B. filmed the incident on his cell phone and estimated that it was only seconds from the time the officers knocked on Baez's door to the time they broke through the door. He thought that he heard an officer say "search warrant" prior to the officers' entry.

At the hearing, the Court accepted into evidence Government's Exhibit 1, a copy of the surveillance video recorded by the agents' fixed wing airplane. The video corroborates Matson's account of the controlled delivery of the interdicted parcel. It is consistent with his testimony that Baez received the package into his car, transported it to his home, and took the package inside his residence. The video also corroborates Matson's testimony that Baez was observed exiting the back of his home and depositing the parcel over a fence onto a neighboring property, then retreating back into the house. The video does not have an audio component, however. Moreover, it does not clearly capture the officers' entry through the front area of Baez's home. Therefore, Matson's account of the officers' entry is not corroborated by Government Exhibit 1.

The Court also accepted into evidence Defense Exhibit A, which is a copy of a video that A.B. captured on his cellphone camera. This video was taken from a location across the street from the front of Baez's home. The video depicts the officers' actions as they initially gathered,

then approached and breached the front entrance of Baez's dwelling. Unlike Government

Exhibit 1, Defense Exhibit A has an audio component.

As the video begins, the officers are shown arriving on scene and dispersing, with

numerous officers assembling at the front of the residence. At approximately the 0:24 second

mark, an officer yells, "Compromise! Compromise! Compromise!" One second later (0:25), an

officer yells "State Police" four times and demands the occupants "Open up!" At approximately

0:29 on the video, the officers make their initial forced entry through the outer door of the

structure, into an enclosed porch-like area. Three seconds later (0:32), officers are heard

announcing, "State Police! Open up! Secondary breach!" At approximately 0:37, a directive to

"Hit it!" can be heard, along with another announcement of "State Police!" At approximately

0:41, a speaker yells "Hit it again!" -- presumably signaling the officers' attempt to breach the

front interior door to the home. By approximately 0:45, it appears the police are inside the

dwelling, and at approximately 0:51, a directive to get "On the ground!" is heard, presumably a

direction from the officers for Baez to get down onto the floor of his kitchen.

### C. Credibility Determination

On a motion to suppress evidence, the trial court is the finder of fact and must determine

the credibility of witnesses, weigh the evidence, and reach "any inferences, deductions and

conclusions to be drawn from the evidence." *United States v. Cole,* 425 F. Supp. 3d 468, 473

(W.D. Pa. 2019). As the finder of fact, this Court "is free to accept or reject any or all of a

witness's testimony." *United States v. Murphy*, 402 F. Supp. 2d 561, 569 (W.D. Pa. 2005)

(citation omitted). The Court makes its credibility determinations by considering "numerous

factors, including the witness's demeanor and manner while on the stand, the witness's ability to

accurately recollect the matters at hand, the manner in which the witness may be affected by the

outcome, the extent to which the witness's testimony is either supported or contradicted by other evidence and testimony in the case, and, ultimately, the extent to which it withstands a common sense test of reason and logic." *Id.* A witness' testimony is not to be judged more or less credible because the witness is a law enforcement officer. *Id.* at 569-70 (citations omitted).

In substantial measure, the Court finds Trooper Matson to be a credible witness. His demeanor while testifying was straightforward and devoid of any obvious bias, and he displayed a good recall concerning many of the events in question. While Trooper Matson may have a professional interest in the outcome of this case, he will not be personally impacted by it. The surveillance footage from the fixed wing airplane corroborates numerous aspects of Trooper Matson's testimony, including his description of the controlled delivery, Baez's receipt of the interdicted package that contained sham contraband, Baez's transportation of the package to his home on West 15th Street, Baez's exit out the rear door of his premises, his attempt to discard the package over a neighboring fence after the police arrived on scene, and his retreat back into his home. Accordingly, the Court credits these aspects of Trooper Matson's testimony. The Court also credits Trooper Matson's description of Baez's arrest within the home. Finally, the Court credits Trooper Matson's assertion that no search of the residence or car occurred until after he returned with a warrant to search those places.

On the other hand, the Court does not credit the portion of Trooper Matson's testimony concerning the officers' entry into Baez's home. On this point, the Court finds that the cellphone video captured by A.B. is the best evidence of what actually occurred, and that video contradicts Trooper Matson's account of the officers' entry in material respects. Specifically, Trooper Matson recalled the following sequence of events: 1. officers collectively approached the front entrance to Baez's home; 2. the officers announced their presence (with one officer possibly

announcing inaccurately that they had a search warrant); 3. someone in the group yelled out "compromised"; 4. the officers then heard over the radio that Baez had run out the back door and discarded the package over a neighboring fence; and 5. the officers then made their entrance into the front of the home.

In contrast to Trooper Matson's testimony, the video shows that the "compromise" callout was made almost at the moment of the officers' arrival at the front door, and prior to them announcing their presence. Further, the video shows the officers attempting to make a forced entry through the outermost door of the structure within four seconds of the "compromise" callout. Whereas Matson testified that the call out of "compromise" meant the occupants within the residence had seen the officers and were not opening the door, the timing of events as shown on the video suggests that there was no meaningful opportunity for the officers to reasonably gauge whether or not the occupants were complying or were going to comply with a lawful police directive. This conclusion is buttressed by the physical layout of the building, as depicted in the cellphone video, which casts doubt on any suggestion that the police and the occupants inside Baez's residence had a clear line of vision to one another.[3] Finally, when the Government's and Defendant's video exhibits are viewed in tandem, it appears that Baez did not exit his home until *after* the officers were already in the process of breaching the front outer door of the structure. Thus, the Court cannot credit Trooper Matson's account of the officers' entry into Baez's dwelling. Nevertheless, the Court attributes any inaccuracies in Trooper Matson's

---

[3] The video and testimony suggest that Baez's home was part of a row of separate town-houses, which were connected in a single structure. As best the Court can tell, Baez's residence was interior to at least one other residence, meaning that any occupant inside his living area would not have had an obvious line of sight to the street corner where the officers first assembled and from whence they made their approach. At the very least, this aspect of the record was underdeveloped. Thus, the Court cannot reasonably infer that the officers were able to clearly see within Baez's living area as they made their approach to his front porch area.

testimony to a lapse in recollection as opposed to any intent to deceive, given the passage of time, the intensity of the situation, and the brief time in which the events in question occurred.

The Court must also evaluate the testimony of J.G. Having observed her demeanor, the Court finds that she testified in a relatively calm manner and was able to recall the general sequence of events relative to the officers' entry. The Court specifically credits J.G.'s testimony that only 3 to 4 seconds elapsed between the time the officers announced their presence to the time when they breached the outer front entrance. This is generally consistent with the cell phone footage and with the testimony of A.B., who testified to the same effect.[4] The Court further credits J.G.'s testimony that neither she nor Baez was aware of the police officers' presence prior to the moment when they announced themselves and directed the occupants to open the door.

Insofar as J.G. denied ever seeing Baez with a parcel during the events in question, the Court attributes this to her lack of opportunity to witness Baez's possession of the package, or perhaps poor recollection, as opposed to any intentional untruth. Because the officers' entry unfolded quickly and unexpectedly for her, her powers of observation during this time were likely limited. Further, as someone who appears to be closely acquainted with Baez, J.G. may be inclined to recall events in a light that is favorable to Baez. Regardless, the Court finds that Baez did indeed possess the parcel with the sham cocaine, as he is seen on video both taking it into his home and later discarding it into his neighbor's yard. Any suggestion by J.G. to the contrary fails a common-sense test of reason and logic.

---

[4] A.B.'s testimony was extremely limited in scope, but the Court credits his observations concerning the officers' entry, which were consistent with the video he captured on his phone.

### D. Findings of Fact

Because the Court finds defense Exhibit A to be the best evidence of the officers' entry into Baez's home, the Court finds that the entry occurred as depicted on the video and as described herein. Thus, the Court finds that, after Baez was observed taking the package with sham drugs into his home, officers assembled and proceeded to the front porch entrance of the residence. As they approached the enclosed porch door, an officer called out "Compromise! Compromise! Compromise!" One second later, an officer yelled "State Police" four times and directed the occupants to open the door. Within about five seconds of the "compromise" call out, the officers began their forced entry into the outdoor of the residence. Three seconds later, they were inside an enclosed porch-like area and again announced, "State Police! Open up! Secondary breach!" For the next 10 to 15 seconds thereafter, officers undertook a forced entry through the interior door into the residence. During this time (but after the officers had already breached the outer door), Baez exited the rear of the structure and deposited the parcel over a fence onto his neighbor's property. He then retreated into the house, where he encountered officers and was ordered to the ground. The officers then detained Baez in his home while Matson left the property to secure a search warrant. After Matson returned with the warrant, officers searched Baez's residence and car. As a result of this search, they seized a 10mm Glock pistol, several pounds of marijuana, numerous scales, small plastic baggies, a plastic baggie containing 64 rounds of 10mm ammunition, a box of 31 rounds of .38 special ammunition, a vacuum sealer, cutting agents, several cell phones, body armor, and indicia of Baez's residency.

## II.    ANALYSIS

### A.  Challenges Relating to USPS Warrant

Baez moves to suppress "all evidence found in the intercepted package" and "all evidence" that is "derivative from the search of said package[.]" ECF No. 79 at 1.  His motion is predicated on the Government's alleged failure to comply with Federal Rule of Criminal Procedure 41.

In relevant part, Rule 41 states as follows:

**(f) Executing and Returning the Warrant.**

  **(1) Warrant to Search for and Seize a Person or Property.**

    **(A) Noting the Time.** The officer executing the warrant must enter on it the exact date and time it was executed.

    **(B) Inventory.** An officer present during the execution of the warrant must prepare and verify an inventory of any property seized. The officer must do so in the presence of another officer and the person from whom, or from whose premises, the property was taken. If either one is not present, the officer must prepare and verify the inventory in the presence of at least one other credible person. . . .

    **(C) Receipt.** The officer executing the warrant must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken or leave a copy of the warrant and receipt at the place where the officer took the property. . . .

    **(D) Return.** The officer executing the warrant must promptly return it--together with a copy of the inventory--to the magistrate judge designated on the warrant. The officer may do so by reliable electronic means. The judge must, on request, give a copy of the inventory to the person from whom, or from whose premises, the property was taken and to the applicant for the warrant.

***

    **(i) Forwarding Papers to the Clerk.** The magistrate judge to whom the warrant is returned must attach to the warrant a copy of the return, of the inventory, and of all other related papers and must deliver them to the clerk in the district where the property was seized.

Fed. R. Crim. P. 41.

Here, there is no dispute that Chief U.S. Magistrate Judge Lanzillo issued a warrant on August 25, 2023 authorizing the Postal Inspector's search of the intercepted package. Further, the evidence shows that USPS agent Traci McCullough completed and signed a return document on August 25, 2023, indicating that approximately two kilograms of suspected cocaine was seized from the subject parcel prior to the officers' execution of the controlled delivery. *See* ECF No. 59-2. It appears that the prosecution provided the return document to defense counsel after Baez filed one of his previous suppression motions.

Baez objects, however, that no such documentation was ever placed on the docket. His argument for suppression appears to be two-fold. First, Baez seems to be arguing that the warrant and/or search itself was invalid because of the Postal Inspector's failure to comply with the requirements of Rule 41(f) and (i). Alternatively, Baez argues that, even if the search was not invalid, the Government still failed to establish a chain of custody for the contents of the intercepted package, precluding their admissibility into evidence. He reasons that, because there is no evidence indicating the search warrant's return, there is no evidence of contents being taken from the intercepted package. He asserts that, if any property *was* taken from the package, there is no evidence indicating a chain of custody for such property.

Additionally, Baez maintains there are grounds to suspect the police may have tampered with evidence in this case. He posits that the Court must hold a second evidentiary hearing to address this issue.

Upon consideration of Baez's arguments, the Court finds them to be meritless. As an initial matter, the Court acknowledges a technical violation of Rule 41 insofar as the docket does not reflect a return of the warrant and related inventory. Assuming, however, that the Postal Inspector failed to return the warrant and inventory to the issuing magistrate judge, Baez cites no

authority establishing that this type of technical violation renders the warrant or the search itself invalid in the circumstances of this case. Indeed, courts within this judicial district have declined to suppress evidence on the basis of similar technical violations, absent some form of demonstrable prejudice. *See, e.g., United States v. King*, Case No. 2:21-CR-184, 2022 WL 3577914, at *4 (W.D. Pa. Aug. 19, 2022) (denying defendant's challenge to incomplete return of search warrant where the motion was untimely and defendant had not demonstrated any prejudice as a result of the defect); *United States v. Brown*, Criminal No. 15-182, 2017 WL 3593883, at 10 (W.D. Pa. Aug. 21, 2017) (finding that law enforcement's failure to strictly comply with Rule 41 and the magistrate judge's order did not justify suppression of evidence, where there was no evidence of bad faith by the government or prejudice to the defendant). As the court in *Brown* observed:

> Rule 41 requires the officer who executes the warrant to promptly return it to the magistrate judge designated on the warrant. *See* Fed. R. Crim. P. 41(f)(1)(D). "The procedural requirements of Rule 41(d) are essentially ministerial in nature." *United States v. Hall*, 505 F.2d 961, 963 (3d Cir. 1974) (citations omitted). In *Hall*, the U.S. Court of Appeals for the Third Circuit explained that not every violation of the procedures in Rule 41 "however insignificant and however lacking in consequences, should give rise to the remedy of suppression." *Id.* at 964. Rather, a district court should grant a motion to suppress based on a Rule 41 violation only when the defendant demonstrates prejudice, "that is, prejudice in the sense that it offends concepts of fundamental fairness or due process." *Id.*

2017 WL 3593883, at *10 (footnote omitted).

Here, there is no basis for inferring bad faith on the part of the postal agents who investigated the intercepted package, nor has Baez asserted that he was somehow prejudiced by the belated service of the warrant return or the absence of the return and inventory on the docket. Because there has been no colorable showing of unfairness or a potential violation of due process, the Court will not suppress any evidence based on the technical violation of Rule 41.

Regarding Baez's second argument, the Court finds that any defect which may exist in the chain of custody relative to the alleged cocaine ultimately goes the weight of that evidence, not its admissibility. To be admitted at trial, the Government's evidence must first be authenticated. *See United States v. Rawlins*, 606 F.3d 73, 82 (3d Cir. 2010) ("Authenticity is elemental to relevance, for evidence cannot have a tendency to make the existence of a disputed fact more or less likely if the evidence is not that which its proponent claims[.]") (citation and internal quotation marks omitted). "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). "Establishing a chain of custody is one form of proof sufficient to support a finding that the matter in question is what its proponent claims." *Rawlins*, 606 F.3d at 82 (internal quotation mark and citation omitted). Yet our Court of Appeals has "long rejected the proposition that evidence may only be admitted if a 'complete and exclusive' chain of custody is established." *Id.* (citing authority). Rather, "'[t]o establish a chain of custody sufficient to make evidence admissible,' the Government 'need only prove a rational basis from which to conclude that the evidence is what the [Government] claims it to be.'" *United States v. Talley*, 826 F. App'x 158, 162 (3d Cir. 2020) (quoting *Rawlins*, 606 F.3d at 82) (alteration in the original). "The 'burden is not a heavy one.'" *Id.* (quoting *Rawlins*, 606 F.3d at 82.

At this point in the proceedings, it is premature for the Court to determine the admissibility of the suspected cocaine that was allegedly retrieved from the intercepted package. In the "ordinary" case, gaps in the chain of custody affect only the weight of the evidence rather than its admissibility. *See Rawlins*, 606 F.3d at 82-83 ("[S]erious gaps may render a chain of custody so deficient that exclusion is required, . . . but in the ordinary case gaps in the chain go to

the weight of the evidence, not its admissibility[.]") (citations omitted). Baez insists that this is "not an ordinary case" because "[o]ver one year has elapsed since the search was authorized and allegedly conducted, with no warrant return or inventory." ECF No. 83 at 3. Although the Court finds this argument dubious, it is premature at this point to determine the admissibility of the subject evidence based on chain-of-custody issues. Any such determination is best made at time of trial. Because it is presently unclear whether this case will proceed to trial, Baez's first argument in favor of suppression will be denied without prejudice.

To the extent Baez requests a second evidentiary hearing to explore issue of possible evidence tampering, that request will likewise be denied. A defendant is not entitled to an evidentiary hearing on a motion to suppress as a matter of course. *See* Fed. R. Crim. P. 12(c)(1) (providing that the court "may" schedule a motion hearing). The purpose of such a hearing "is to assist the court in ruling upon a defendant's specific allegations of unconstitutional conduct—its purpose is not to assist the moving party in making discoveries that, once learned, might justify the motion after the fact." *United States v. Hines*, 628 F.3d 101, 105 (3d Cir. 2010). Consequently, "[a] motion to suppress requires an evidentiary hearing only if the motion is sufficiently specific, non-conjectural, and detailed to enable the court to conclude that (1) the defendant has presented a colorable constitutional claim, and (2) there are disputed issues of material fact that will affect the outcome of the motion to suppress." *Id.* (citing Voigt, 89 F.3d 1050, 1067 (3d Cir. 1996)) (explaining that a claim is "colorable" if it consists "of more than mere bald-faced allegations of misconduct"); *see Brown*, 2017 WL 3593883, at *11 ("To summarize, the procedure for a defendant who seeks an evidentiary hearing on a motion to suppress is to (1) state a colorable legal claim, (2) identify facts material to that claim, (3) show

why the facts are disputed, and then (4) request a hearing to resolve the dispute.") (quoting *Hines*, 628 F.3d at 108).

Here, Baez states only that, in early January of 2025, two officers visited him and asked him to sign a form acknowledging his forfeiture of fifteen thousand dollars ($15,000.00) in funds that are purportedly related to this matter. Baez contends this was "the first mention of any money in the instant case" and that he "has no knowledge of this money and therefore did not sign the form." ECF No. 83 at 2. He posits that the money "was presumably seized in August 2023," and he infers "that the police were engaged in tampering with evidence," because there is "no accounting for said money" and "no explanation of the means of acquiring said money." *Id.* at 6.

The Court finds that Baez's allegations fail to state a colorable claim of evidence tampering or other constitutional violation as it relates to the Postal agents' search of the interdicted package. Here, it is not even clear that the Government is seeking to utilize the subject funds as evidence in this case. Regardless, Baez's suspicions of evidence tampering are based on mere conjecture and fail to demonstrate that an additional evidentiary hearing is warranted. His request for a hearing will therefore be denied.

### B. Challenge Relating to Defendant's Warrantless Arrest

Baez also argues that the police violated his Fourth Amendment rights when they entered his home and effectuated his arrest[5] without a warrant. He asks the Court to suppress all

---

[5] "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968). "We apply an objective test when evaluating whether an officer's 'show of authority' would have led a reasonable person to believe they were not free to leave." *United States v. Brown*, 765 F.3d 278, 289 (3d Cir. 2014). "Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). "Other factors include middle of the night

17

evidence discovered as a result of the officer's warrantless entry and arrest, and "all evidence derived therefrom."  ECF No. 79 at 3.

Warrantless entries into the home are presumed to be unreasonable for Fourth Amendment purposes, absent an exception to the warrant requirement, including the existence of exigent circumstances.  *United States v. Anderson*, 644 F. App'x 192, 194 (3d Cir. 2016) ("[A] warrantless search or seizure occurring within a home may be sustained where probable cause and exigent circumstances exist.") (citing *Kentucky v. King*, 563 U.S. 52, 459 (2011), and *United States v. Mallory*, 765 F.3d 373, 383 (3d Cir. 2014)).  "Examples of exigent circumstances include, but are not limited to, hot pursuit of a suspected felon, the possibility that evidence may be removed or destroyed, and danger to the lives of officers or others." *Id.* at 194-95 (citing *United States v. Coles*, 437 F.3d 361, 366 (3d Cir. 2006)). When conducting this analysis, courts often consider the six factors laid out in *Dorman v. United States*, 435 F.2d 385, 392–93 (D.C. Cir.1970) (en banc).  These include: (1) the gravity of the crime that has been committed; (2) a reasonable belief that the suspect is armed; (3) a clear showing of probable cause based upon reasonably trustworthy information; (4) a strong belief that the suspect is in the premises; (5) "a likelihood that the suspect will escape if not swiftly apprehended"; and (6) peaceable entry, affording the suspect "an opportunity to surrender ... without a struggle and thus to avoid the invasion of privacy involved in entry into the home." *Id.* at 392-93; *see Anderson*, 644 F. App'x at 194–95.

Here, the Government contends that exigent circumstances justified the officers' warrantless entry and detention of Baez, because they needed to prevent the imminent

---

interactions, use of police lights or sirens, commands to stop or show hands, or repeated commands." *United States v. Williams*, No. 23-2980, 2025 WL 101068, at *3 (3d Cir. Jan. 15, 2025).  Here, the Government does not dispute that the officers conducted a "seizure" of Baez for purposes of the Fourth Amendment.

destruction of evidence while they sought a search warrant for the property. The Government

bears the "heavy" burden of proof on this issue.[6] To that end, the Government has consistently

asserted that a particular sequence of events gave rise to the alleged exigent circumstances,

namely:

> When Baez arrived at and entered his home with another female, J.G., police dressed
> in marked vests identifying themselves as law enforcement surrounded the house.
> Officers approached the front door and knocked and announced their presence. Despite
> the presence of at least two known occupants, no one answered the front door as
> requested by police. Instead, Baez fled to the back of the residence and discarded the
> package over his fence and into an adjacent yard. As police spotted Baez tossing the
> parcel, agents yelled out for him to freeze. However, Baez again disregarded agents'
> requests and quickly returned inside the house. At that point, law enforcement entered
> the residence to arrest Baez.
>
> As police announced their presence at Baez's front door, their requests for him to
> present himself were unmet. Rather, Baez was observed throwing the parcel out of his
> back door and into someone else's back yard, a classic demonstration of an attempt to
> destroy and tamper with evidence. When Baez appeared at his back door, agents gave
> verbal commands to Baez that he also refused to adhere to. This further heightened
> agents' fears that the continued pursuit to destroy evidence was underway. In turn,
> police reasonably believed that exigent circumstances existed to require the
> warrantless entry into Baez's home. . . .

ECF No. 83 at 8-9.

This version of events is predicated on Trooper Matson's description of the officers'

entry into the home. However, for the reasons previously discussed, the Court finds that the

Government's account is not consistent with the video footage, which is the most credible

---

[6] A defendant challenging a search or seizure typically bears the burden of proving that it was illegal. *United States v. Rivera-Raposo*, Case No. 3:22-cr-199, 2023 WL 6460499, at *6 (M.D. Pa. Oct. 3, 2023). "However, once the defendant has established a basis for his motion, *i.e.*, the search or seizure was conducted without a warrant, the burden shifts to the government to show that the search or seizure was reasonable." *Id.* (citation and internal quotation marks omitted). Here, the Government bears the burden of establishing that the agents' warrantless entry into Baez's home and warrantless arrest of him therein was justified by exigent circumstances. That burden is a heavy one. *See United States v. Mallory*, 765 F.3d 373, 383–84 (3d Cir. 2014); *United States v. Robinson*, No. CR 3:21-27-2, 2024 WL 3823490, at *7 (W.D. Pa. Aug. 14, 2024).

19

evidence of record. Instead, the video evidence suggests that officers began their forced entry into the premises only seconds after announcing their presence and demanding that the occupants open the door, leaving Baez and J.G. no meaningful opportunity to comply with their directive. Additionally, a comparison of the Government and defense video evidence suggests to the Court that Baez did not exit the rear of the structure or discard the package until after the officers had already breached the outer door to the residence and begun their forced entry through the inner doorway.

Applying the *Dorman* factors, the Court finds that the officers had sufficient probable cause to believe that Baez was attempting to engage in large scale trafficking of cocaine, which is undoubtedly a serious crime. Further, the officers had observed Baez entering the premises and had objectively reasonable grounds to believe that he would have weapons within his home. Thus, the first four *Dorman* factors support a finding of exigent circumstances.

The other two *Dorman* factors, however, are not indicative of exigent circumstances. In this Court's view, the Government has not provided credible evidence that Baez was aware of the officers' presence or that he was about to flee the scene prior to the moment when the police first announced their presence and then forced their way through the outer door of the structure. Nor is this a situation where officers made a peaceable entry or afforded Baez a meaningful "opportunity to surrender ... without a struggle and thus to avoid the invasion of privacy involved in entry into the home." *Dorman*, 435 F.2d at 393; *see Anderson*, 644 F. App'x at 194–95. On the contrary, as discussed, the video footage suggests that officers undertook a forced entry into the enclosed porch area of the home within seconds of assembling at Baez's front door and announcing their presence. It appears to the Court that this entry occurred prior to the point when Baez would have exited the back door and discarded the package.

In *Kentucky v. King,* the Supreme Court noted that "warrantless searches are allowed when the circumstances make it reasonable, within the meaning of the Fourth Amendment, to dispense with the warrant requirement." 563 U.S. at 462. "Therefore, . . . the exigent circumstances rule justifies a warrantless search when the conduct of the police preceding the exigency is reasonable in the same sense." *Id.* "Where . . . the police did not create the exigency by engaging or threatening to engage in conduct that violates the Fourth Amendment, warrantless entry to prevent the destruction of evidence is reasonable and thus allowed." *Id.* Here, there is evidence to suggest that the officers' forced entry led to Baez exiting the structure and attempting to jettison the package containing sham cocaine. The Court cannot say that the Government has met its heavy burden of demonstrating that the officers' warrantless entry and arrest of Baez within his home was justified by exigent circumstances.

This merely begs the question, however, whether suppression of evidence is an appropriate remedy. Under the fruit of the poisonous tree doctrine, an officer's unlawful conduct taints the evidence obtained as a result thereof. *See United States v. Jackson*, No. 23-1707, 2024 WL 4689013, at *3 (3d Cir. Nov. 6, 2024) ("The Fourth Amendment . . . generally requires that evidence obtained as the result of an unlawful search or seizure be suppressed as "fruit of the poisonous tree," *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *United States v. Alexander*, 54 F.4th 162, 170 n.11 (3d Cir. 2022)). Here, Baez requests that the court suppress all evidence acquired as the result of the officers' unlawful entry into his home and ensuing arrest.

The Court will deny Baez's request to suppress evidence in this case for two reasons. First, the Court finds that any evidence the agents acquired as a result of their unlawful entry is admissible under the inevitable discovery doctrine. Specifically, "where evidence is obtained in

violation of a defendant's constitutional rights, that evidence is admissible at trial if the government can show 'by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means.'" *United States v. Boyer*, No. CR 18-249-6, 2019 WL 3717669, at *5 (E.D. Pa. Aug. 6, 2019) (quoting *Nix v. Williams*, 467 U.S. 431, 444 (1984)). In applying this rule, courts must consider "'(1) whether a neutral justice would have issued the warrant even if not presented with the unlawfully-obtained information; and (2) whether the initial entry prompted the officers to obtain the search warrant.'" *Id.* (quoting *United States v. Herrold*, 962 F.2d 1131, 1144 (3d Cir. 1992)); *see also United States v. Perez*, 280 F.3d 318, 339 (3d Cir. 2002). "'If the answers to these questions are yes and no respectively, ... then the evidence seized during the warranted search, even if already discovered in the original entry, is admissible.'" *Id.* (quoting *Herrold*, 962 F.2d at 1144). In such cases, the "[e]xclusion of physical evidence that would inevitably have been discovered adds nothing to either the integrity or fairness of a criminal trial." *Nix*, 467 U.S. at 447. Thus, "courts routinely determine suppression is not warranted when the evidence in question would have been inevitably discovered." *United States v. Bell*, No. 3:24-CR-00052, 2025 WL 388824, at *6 (M.D. Pa. Feb. 4, 2025).

In this case, the Government offered uncontradicted testimony from Trooper Matson that his main objective in entering the house was to secure the occupants and the premises so that officers could apply for a search warrant. That is, in fact, what occurred. Trooper Matson testified -- again in uncontroverted fashion -- that, once inside the dwelling, officers detained Baez and J.G., ensured that no other individuals were inside the residence and that no evidence was being destroyed, then secured the premises for the purposes of applying for a warrant. Matson was clear in his testimony that, apart from these actions, no search occurred until a

warrant was obtained.  The Court accepts this undisputed testimony as credible.  The Court also notes that, while the search warrant for Baez's house and car is not part of the record, there has been no challenge from the defense concerning either the existence of the warrant, or its conformity with Fourth Amendment requirements.  Based on the credible evidence of record, the Court finds that officers had sufficient evidence to establish probable cause for a search of the targeted areas, regardless of their entry into Baez' house.  Under well-established principles, they needed only to establish a "fair probability that contraband or evidence of a crime would be found" in the locations to be searched.  *Illinois v. Gates*, 462 U.S. 213, 238 (1983).  Prior to approaching and entering Baez's home, Matson was aware that Baez had taken possession of a package that ostensibly contained some two kilograms of cocaine and had transported the package to his home.  Matson was also aware that Baez had been the subject of a previous drug investigation.  Matson knew that two kilograms of cocaine was an amount consistent with drug distribution.  He also knew that individuals involved in drug trafficking frequently possess weapons for the purpose of protecting themselves, their drugs, and their proceeds.  Thus, the Court finds, by a preponderance of credible evidence, that a neutral justice would have issued the search warrant even without any unlawfully-obtained information.  The Court also finds, by a preponderance of evidence, that it was not the officers' entry into Baez' home, or any evidence discovered therein, that prompted Matson to obtain the warrant, because Matson had already formed the intention to apply for a search warrant prior to the officers' entry.  Accordingly, suppression of evidence is not warranted in this case because the evidence which the officers recovered as a result of the subsequent search warrant execution would have been inevitably discovered in any event.

Second, the Court's considerations of officer culpability and deterrence preclude its application of the exclusionary rule in this case. "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring v. United States*, 555 U.S. 135, 144 (2009). "When the police exhibit 'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs." *Davis v. United States*, 564 U.S. 229, 238 (2011). However, "when the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force, and exclusion cannot pay its way." *Id.* at 238.

In this case, the officers' entry into Baez's home occurred under circumstances that were undoubtedly tense, confusing, and rapidly unfolding. To the extent Matson or other officers erred in their judgment about the exigency of the circumstances, the Court finds that this was attributable to, at most, isolated negligence rather than deliberate, reckless, or grossly negligent misconduct. Therefore, the exclusion of evidence in this case would not serve as a meaningful deterrent against future police misconduct. Moreover, given the severity of the crimes at issue, and the highly probative value of the evidence that would be suppressed, any marginal deterrent benefit that would be achieved through application of the exclusionary rule is outweighed by the "price paid by the justice system." *Herring*, 555 U.S. at 144.

## III.    CONCLUSION

Based upon the foregoing reasons, which constitute the Court's findings of fact and conclusions of law, Baez's motion to suppress will be denied.

An appropriate Order follows.

SUSAN PARADISE BAXTER
United States District Judge